IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

GLENN MASLOWSKI,

               Plaintiff,

    v.

CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

HONORABLE JEROME B. SIMANDLE

Civil No. 15-1833 (JBS/AMD)

**<u>OPINION</u>**

---

APPEARANCES:

Alan H. Polonsky, Esq.
POLONSKY & POLONSKY
512 S. White Horse Pike
Audubon, NJ 08106
    Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
    By: Maija DiDomenico
        Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
P.O. Box 417777
Philadelphia, PA 19101
    Attorney for Defendant

**SIMANDLE**, Chief Judge:

## I.   INTRODUCTION

In this action, Plaintiff Glenn Maslowski (hereinafter, "Plaintiff"), seeks review pursuant to 42 U.S.C. § 405(g) of the Commissioner of the Social Security Administration's (hereinafter, "Defendant") denial of his application for

disability benefits pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 404-34, 1381-83f (hereinafter, the "SSA").

Plaintiff claims he is disabled due to degenerative disc disease of the lumbosacral and cervical spine resulting from a car accident, and due to depression and anxiety. (See Pl.'s Br. at 5, 7.) On September 18, 2013, Administrative Law Judge Joseph M. Hillegas (hereinafter, the "ALJ") issued a 15-page decision denying Plaintiff Social Security benefits from the alleged onset date of disability through the date of the ALJ's decision. (See R. at 13-30.) The ALJ found Plaintiff's physical impairment of degenerative disc disease severe but ultimately concluded that Plaintiff was "'not disabled'" because he had a residual functional capacity to perform a full range of light work, and a significant number of jobs existed in the national economy for Plaintiff.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on five grounds. Plaintiff contends that the ALJ erred (1) in finding that Plaintiff's sole severe impairment was degenerative disc disease; (2) in finding that Plaintiff was not a credible witness; (3) in finding that Plaintiff had the residual functional capacity to perform a full range of light work; (4) in relying solely on the Medical-Vocational Guidelines to find

that Plaintiff was not disabled; and (5) in failing to consider Plaintiff disabled for a closed, 12-month period of disability.

For the reasons explained below, the Court finds that substantial evidence supports the ALJ's determinations, and will affirm the ALJ's decision.

## II.  BACKGROUND

### A. Procedural History

On September 10, 2011, Plaintiff Glenn Maslowski completed an application for Social Security Disability benefits under Titles II and XVI of the SSA. (R. at 175-187.) The claim was initially denied on January 5, 2012. (R. at 99-103.) Upon reconsideration, it was denied again on May 25, 2012. (R. at 133-135.) A hearing was held before the ALJ on August 8, 2013, resulting in an unfavorable decision on September 18, 2013. (R. at 13-30.) Plaintiff appealed the decision to the Appeals Council, which denied review on January 16, 2015. (R. at 6.) Following the denial of review, Plaintiff filed this Complaint against the Commissioner of Social Security.

### B. Plaintiff's Medical Record

The following facts are relevant to the present appeal. Plaintiff Glenn Maslowski is 52 years old and was 45 years old when he was involved in a motor vehicle accident which allegedly caused his present disability. Prior to the accident, he was employed as a ramp serviceman for United Airlines, and also had

past relevant work experience as a limo driver, motor coach operator, and line serviceman. (R. at 205, 218.) His disability claim is based primarily on his neck and back pain, depression, anxiety.

1. <u>Initial X-Rays and MRIs</u>

On June 15, 2008, approximately one year prior to the alleged disability onset date, Plaintiff Glenn Maslowski was involved in a motor vehicle accident where his stopped vehicle was struck from behind at approximately 45 miles per hour, resulting in injuries to the neck and lower back. (<u>See</u> R. at 340.) X-rays of Plaintiff's spine were ordered in July 2008 by Dr. Charles Kastenberg at Mt. Holly Family Practice. The X-rays showed that Plaintiff had "mild degenerative changes" to L5-S1 in Plaintiff's spine and a transitional vertebral body, which appeared to be attempted lumbarization of S1, but otherwise showed no bone destruction, intact disc spaces, and "no significant abnormalities." (R. at 434-35.)

An MRI of Plaintiff's lumbar spine was done in August 2008, which found "mild degenerative changes [] scattered through the lumbar region," specifically at L2-L3, L4-L5, and L5-S1. (R. at 278.) The MRI found irregular herniation across the L1-L2 disc margin; "very large" broad herniation across the L2-L3 disc margin; a disc bulge at L4-L5 "without narrowing of the central canal or foramina; and "mild" herniation centrally at L5-S1.

2

(Id.) The MRI found impingement on the thecal sac at the L1-L2 and L5-S1 disc margin and "significant" impingement on the thecal sac at the L2-L3 disc margin.[1] (Id.)

In November of 2008, an MRI of Plaintiff's cervical spine was also performed, which found a right paracentral disc herniation at C5-C6 and small central disc herniations at C6-C7 and T1-T2. (R. at 277.)

2. Treatment with Dr. Peter Arino and Dr. Vinent Padula

Plaintiff began regular treatment for neck and back pain at South Jersey Pain Consultants in October 2008 with Drs. Peter Arino and Vincent Padula. Plaintiff self-reported to Dr. Arino in October 2008 that he experienced a "dull aching pain" in the neck and lower back, which is present in most positions and intensified by physical activity. He reported that the pain did not interrupt his sleep pattern at night. (R. at 340.) Treatment records from South Jersey Pain Consultants through 2009 show that Plaintiff was treated with narcotics and epidural injections but continued to report pain. In one report from September 30, 2009, Plaintiff stated that he "cannot function at all with his level of pain." (R. at 322, 331.) However, the records also show that Plaintiff was observed as being alert,

---

[1] The radicular symptoms of these neural compromises were later confirmed via EMG/NC study by Dr. David C. Lee on January 26, 2011.  (R. at 305.)

oriented times three, having normal gait and extremities, grossly intact cranial nerves, normal straight leg raising, and no motor weakness or atrophy, although they sometimes noted that he was tender to palpation with flexion and extension of his lumbar spine. (R. at 320, 323, 331, 334-35, 337, 341.)

Dr. Padula noted that neither he nor Dr. Barr recommended any surgical procedures. (R. at 322.) He did, however, certify Plaintiff for an intradiscal electrothermal anuloplasty ("IDET") procedure, which was performed in December 2009. (R. at 320, 322). Plaintiff saw Dr. Padula in April of 2010, approximately four months after the procedure, and stated that he was "doing well" and was not experiencing any side effects. (R. at 318.) Dr. Padula prescribed Oxycodone and a Fentanyl Patch 50 mcg for use every two days. (Id.)

Plaintiff returned to Dr. Padula in February 2011 complaining that his pain symptoms had returned following initial relief from the IDET procedure. (R. at 316, 318.) Dr. Padula advised Plaintiff he would not prescribe narcotics, instead recommending anti-inflammatory medications and an epidural steroid injection. (R. at 316-17.)

3. Treatment with Dr. Louis Spagnoletti

Around May of 2010, Plaintiff began further treatment with Dr. Louis Spagnoletti, a rehabilitation and sports medicine physician. (R. at 379-415, 436-51). During the routine monthly

4

office visits through January 2012, Plaintiff consistently
reported pain levels of 5, 5-6, or 6, and Dr. Spagnoletti
routinely prescribed Plaintiff opioid analgesic medications.
(Id.) Dr. Spagnoletti also consistently reported that Plaintiff
experienced tenderness and trigger points in his gluteal muscles
and left paraspinal lumbar muscles, but had intact motor
strength, sensation, and proprioception; a "non-antalgic" gait
without assistive device; good balance; the ability to stand on
his heels and toes; full (5/5) muscle strength in his arms and
legs; intact deep tendon reflexes; and intact memory, normal
sensorium, and fluent speech. (R. at 379-415.)

      4. Treatment with Dr. David Lee

      Plaintiff stopped meeting with Dr. Spagnoletti for a few
months in late 2010 and early 2011 to get the opinion of Dr.
David C. Lee. In November of 2010, Plaintiff had a neurologic
consultation with Dr. David Lee regarding complaints of chronic
back pain, depression, and anxiety, alongside supposed sleep
apnea, sexual dysfunction, and confusion resulting from narcotic
medication use. (R. at 307-10.) Plaintiff complained of gaining
weight, suffering from fatigue, having trouble with
concentration and memory, having visual problems, having
increased pain, weakness of the extremities, depression,
anxiety, insomnia, sensitivity to temperature, gastric distress,
and daytime drowsiness as a result of the weight gain. (R. at

308.) However, Plaintiff also attested to cycling and lifting weights and expressed interest in stopping pain medications and returning to work. (R. at 308.) Plaintiff appeared anxious on examination but had a "fairly clear" mental status and intact memory; in other words, he did not appear over-medicated. (R. at 308.) Despite myofascial spasms and pain in his lower back and buttocks, Dr. Lee noted that Plaintiff exhibited "good" strength, grossly intact sensation, intact cranial functions, normal and independent walking ability, and no dysarthria, aphasia, or dysmetria. (R. at 308.) Dr. Lee ordered further diagnostic testing, opining that Plaintiff had "a decent chance to get off narcotics and Suboxone, and to be neurosurgically repaired." (R. at 310.)

Dr. Lee ordered a lumbar spine MRI, which revealed only a "moderate disc herniation" at L1-L2 and "mild disc bulges" at L2-L3, L4-L5, and L5-S1. (R. at 311-12.) Specifically, the MRI found a central disc herniation at L1-L2; a mild diffuse disc bulge at L2-L3 and L4-L5 with encroachment into the neural foramina bilaterally resulting in mild to moderate bilateral neural foraminal stenosis; and a focal disc bulge at L5-S2 which "slightly" flattens the thecal sac and mild bilateral neural foraminal stenosis. (Id.) The S1 vertebra was also partially lumbarized. (Id.) An EMG and motor nerve conduction study was also done, which revealed "left L5 radiculopathy, acute and

chronic, mild to moderate," which Dr. Lee attributed to a superior disc. (R. at 313-14.)

Dr. Lee discontinued Plaintiff's narcotics, and in one follow-up visit in late 2010, Plaintiff reported he was doing "100% better" and that his sleep apnea had also resolved. (R. at 306.) Dr. Lee administered six myofascial trigger point injections to Plaintiff's right lower back and buttocks to treat Plaintiff's pain. He noted Plaintiff appeared "much clearer" during this visit. (R. at 306.) In a second follow-up visit in January of 2011, Dr. Lee noted that Plaintiff was essentially off all narcotics and "looks much calmer than he did before."

5. Treatment with Dr. Louis Spagnoletti

Nevertheless, Plaintiff went back to regular treatments with Dr. Spagnoletti the next month, in February of 2011, and continued regular visits for the rest of the year. Dr. Spagnoletti. He continued to report pain levels at 5-6 and was prescribed opioid analgesics, specifically 15 milligrams and 30 milligrams of Roxicodone, as well as a duragestic patch for the pain. He was also prescribed medication for depression, anxiety, and insomnia. (R. at 375-95, 436-51.)

Of particular importance, Dr. Spagnoletti's notes reflect that in October 2011, Plaintiff reported that he planned to return to work at United Airlines (R. at 412), and in January 2012, he reported that he went kayaking. (R. at 436.)

6. <u>Dr. Steven Rosen</u>

With respect to work-preclusive limitations, Dr. Steven Rosen, the Plaintiff's treating pain management specialist, completed a "Pain Questionnaire" on Plaintiff's behalf in October 2011, effective since June 8, 2009. (R. at 416-22.) In the questionnaire, Dr. Rosen opined that (1) if the Plaintiff were to return to his prior physically-intensive work, he would require a ten minute rest period per hour in addition to lunch and regular breaks; (2) that his pain seriously impairs his ability to function; and (3) that this pain would interfere with his ability to function satisfactorily between 34-66% of the work day. (<u>Id.</u>) Dr. Rosen also opined that Plaintiff would miss two or more days of work a month due to symptoms, and that these limitations were consistent with objective medical evidence. (<u>Id.</u>)

7. <u>Dr. Charles Kastenberg</u>

Plaintiff's family physician, Dr. Kastenberg, completed a form stating that as of April 14, 2011, Plaintiff could return to regular duty work for United Airlines, but noted that he should not bend, lift, or climb. (R. at 354.)

In two routine visits with Dr. Kastenberg at the end of 2011, Plaintiff reported having back pain and pain in his knee after having knee surgery and still using crutches. (R. at 428-33.) Although Plaintiff reported having "severe" back pain, he

also stated that he was "generally feeling good," and that his back pain was "moderate, controlled by meds." (R. at 431.) Dr. Kastenberg's physical examination at that time revealed that Plaintiff had tenderness and "moderate pain w/ motion" in the right knee, and lumbar spine muscle spasms with "moderately reduced ROM." (R. at 430.) Dr. Kastenberg also noted that Plaintiff had an intact memory, normal orientation, no edema, and appropriate mood and affect. (Id.)

From March 2012 to 2013, Plaintiff attended five routine office visits with Dr. Kastenberg. (R. at 467-76.) At Plaintiff's final office visit on March 29, 2013, Dr. Kastenberg concluded that Plaintiff's cervicalgia and back pain were "resolved," his depression "improved," and his anxiety "doing well." (R. at 467.)

8. Psychological Counseling Reports

Plaintiff attended outpatient counseling for anxiety at Healthmark Counseling from 2006 through September 2011. (R. at 357-72.) According to the counseling notes, prior to his alleged disability, Plaintiff experienced anxiety associated with his job at United Airlines, where he was being harassed by co-workers, and anxiety triggered by financial concerns. After the accident, Plaintiff reported that although the pain continued to hamper his physical abilities and affect his mood, the medication was having a "positive effect" on his pain. (R. at

366.)

A few months after Plaintiff underwent the IDET procedure, he stated that he was satisfied with the procedure and effectiveness of the medications and expressed an interest in returning to work. (Id.) The notes from early 2010 show that Plaintiff's mood was "stable" and that he was feeling "somewhat more hopeful," although his anxiety "tend[ed] to increase when thoughts of ongoing stressors intrude." (Id.) Plaintiff was also hopeful about returning to work, and felt "somewhat more organized and empowered," and "more in control of anxiety." (Id.) His anxiety was triggered by thoughts of ongoing stressors such as financial concerns and work. One counseling note dated January 19, 2010, indicated that Plaintiff expressed concerns about returning to the same hostile work environment, but was also resistant to discussing alternative or lateral transitions from United Airlines, saying "I like my job. Why should I be the one to suffer?" (Id.)

From February 2012 to August 2013, Plaintiff attended outpatient medication management visits with psychiatrist John Wilkins. (R. at 477-491.) Dr. Wilkins diagnosed Plaintiff with depression and anxiety, but routinely noted a mostly normal mental status, observing that Plaintiff had a full range of affect, a neat appearance, a cooperative attitude, good comprehension, intact concentration, intact insight, good

judgment, either a calm or anxious mood, normal orientation, normal psychomotor behavior, normal speech, a logical thought process, and no suicidal ideations, delusions, or hallucinations. (R. at 481-89, 491.) Dr. Wilkins prescribed medications for depression and anxiety, whicsh included Effexor, Cymbalta, and Abilify. (R. at 477-491.)

9. Plaintiffs' Function Reports

In two Function Reports to the Social Security Administration, submitted December 2011 and February 2012, Plaintiff reported that he lived alone with a cat and dog. (R. at 226, 227, 243.) Under "Household Chores," Plaintiff listed preparing meals, cleaning his home, doing household repairs, and washing his laundry every two days. (R. at 228, 244.) His daily activities included cleaning his home on a daily basis, doing paperwork, making phone calls, and making necessary appointments with doctors and lawyers. (R. at 226.) He needed no reminders to care for himself, take medication, or go places. (R. at 228, 230, 243.) He also reported that once or twice a week, he went shopping for groceries and kayak supplies and to pick things up for his mother. (R. at 229.)

Additionally, Plaintiff reported going out on sunny days, visiting friends, writing emails, and playing with a flight simulator on his computer. He noted that he sometimes flies with a friend who owns his own airplane and also joined the Civil Air

11

Patrol and flies training missions. (R. at 227-28, 230.) Under
"Hobbies and Interests," He stated that since his disability and
because he experienced chronic pain, he could no longer work out
regularly, bike long distances, work two jobs, do house or car
repairs, or participate in many outdoor sports. He added that he
now had "some difficulty" with whitewater kayaking, although he
could still go kayaking if the water was calm. (R. at 228.)

    10.   <u>Consultative Psychological Exam by Dr. Theodore Brown</u>

    Plaintiff had a psychological consultative exam by Dr. J.
Theodore Brown, Jr., on November 29, 2011. (R. at 423-27.) He
stated that he had been seeing a psychologist for depression and
anxiety for the last four years. (R. at 423.) He reported that
he was living alone and claimed that he could care for his own
personal and grooming needs, including cooking, cleaning,
washing laundry, and shopping for himself. He managed his own
money and although his family relationships were not good, he
had some friends. He was also able to drive, and listed hobbies
such as aviation, bowling, recreations, cycling, and traveling.
(R. at 425.) He reported that he was "sad, unhappy, and
depressed," but denied crying or thoughts of suicide. His energy
level was and mood were "okay," and his sexual energy, interest,
and activity were "good." He reported that his memory, focus,
and concentration were poor. (R. at 424.)

    Dr. Brown observed that Plaintiff was pleasant and

12

cooperative with an adequate overall presentation, adequate
hygiene, normal motor behavior, appropriate eye contact, and a
normal gait. (Id.) He exhibited normal orientation, average
intellectual functioning, fair insight, a neutral mood, clear
sensorium, fluent and clear speech, and intact immediate memory.
(R. at 425.) He could remember three of three items immediately
and two of three items after five minutes, was able to repeat
six digits forward and three backwards, could perform simple
calculations, and was able to count backwards from 100 by
sevens. Plaintiff was also noted as being "coherent and goal
directed" and his affect was "[a]ppropriate to thought content
with full range of speech associated with thought content."
(Id.) Nevertheless, Dr. Brown assessed Plaintiff a Global
Assessment of Functioning (GAF) score of 55 to 60. (R. at 426.)

    11.  State Agency Opinions

    Dr. Seung Park and Dr. Floyd Turnan reviewed Plaintiff's
medical records. (R. at 63-85.) Dr. Park opined that Plaintiff
could occasionally lift and/or carry (including upward pulling)
a weight of 20 pounds, frequently lift and/or carry 10 pounds,
and stand for about six hours in an 8-hour workday. He noted
several postural limitations, including "occasionally" being
able to climb stairs, balance, kneel, crouch, stoop, and crawl,
and not being able to climb ladders or scaffolds. He noted that
Plaintiff had no other limitations for pushing and/or pulling,

and no manipulative, visual, communicative, or environmental
limitations. (R. at 67-68.)

With respect to his mental residual functional capacity,
Dr. Turnan opined that Plaintiff was not significantly limited
in his ability to remember locations and work-like procedures,
make work-related decisions, understand and remember short and
detailed instructions, sustain and ordinary routine and work
with others without being distracted. There was also no
significant limitation in Plaintiff's ability to be aware of
normal hazards, travel to unfamiliar places, or set realistic
goals and make plans independently of others. Plaintiff also had
no social interaction limitations. (R. at 69-70.)

However, Plaintiff was said to be moderately limited in his
ability to maintain attention and concentration for extended
periods; to perform activities within a schedule, maintain
regular attendance, and be punctual within customary tolerances;
and to complete a normal workday without interruptions from
psychologically-based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods.
(R. at 69-70.)

### C. Plaintiff's Testimony before the ALJ

Plaintiff testified before Administrative Law Judge Joseph
M. Hillegas, on August 8, 2013. (R. at 31-59.) He stated that he
attempted to return to his job as a ramp serviceman with United

Airlines from June to December 2012, where employees are
required to lift up to 70 pounds, with occasional freight pieces
weighing up to 200 pounds. (R. at 38-39.) Indeed, Plaintiff
himself described it as a "very physical job." (R. at 43.) After
struggling with work as a result of his injuries, he visited
United's employee assistance program, where it was recommended
that he assume a lighter position, such as customer service. (R.
at 39-41.) However, Plaintiff neither accepted nor requested
such accommodations, saying that he had not asked for the
accommodation because he wanted to see "if [he] can do ramp
service again." (R. at 41.)

    Plaintiff insisted that the pain resulting from the
accident was too severe for him to work as of 2009, but by his
own estimates, also noted that the pain had improved at least 40
percent with treatment. (R. at 41-42.) He explained that he
began with heavy opioid narcotics (OxyContin) for pain
management around June 2009, though the medications were later
discontinued when Plaintiff developed a dependency. (R. at 44-
45.) Plaintiff also underwent physical therapy. (R. at 42, 46-
47.) By winter of 2010, Plaintiff estimated he could walk about
a quarter mile before needing to take a break, and was able to
drive his car again by June 2011. (R. at 44, 49.) He also noted
that he began kayaking the summer of 2011 and would try to kayak
every couple of weeks. (R. at 50-51.) He was also exercising to

try and rebuild core strength.  (R. at 50-51.)

At the time of the hearing, Plaintiff was working a part-time job driving a fifty-six passenger bus. (R. at 53.) While the job can require loading heavy items into the bus, Plaintiff testified to not doing so. (R. at 54.) He expressed some discomfort with sitting for extended periods of time (R. at 53), but ultimately confirmed that he could perform the job full-time. (R. at 55.) Plaintiff also confirmed he could work the gate attendant job suggested by United Airlines. (Id.) At closing, the ALJ asked Plaintiff's attorney whether he had any specific evidence going towards the functional limitations that would show that Plaintiff was unable to perform a less strenuous job at United Airlines, and Plaintiff's counsel was unable to list any. (R. at 57-58.)

**D. The ALJ Decision**

ALJ Hillegas issued a detailed 15-page written decision on September 18, 2013, ultimately finding that Plaintiff was not disabled within the meaning of the Social Security Act, because he had the residual functional capacity to perform the full range of light work. The ALJ relied at length upon Plaintiff's statements and testimony concerning his functional abilities and limitations, in addition to the various consultative examiner's findings and observations and the testimony adduced during the hearing. (R. at 13-30.)

The ALJ first determined that Plaintiff's degenerative disc disease of the lumbosacral and cervical spines were severe impairments, and that his mental impairments were non-severe because they did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental work activities. (R. at 18-19.)

In making this finding, the ALJ considered four broad functional areas, otherwise known as the "Paragraph B" criteria: (1) daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. (R. at 19-23.) The ALJ found mild limitation in the first three areas, noting that despite the extent of treatment Plaintiff undertook and its weight on his social life, Plaintiff was able to live independently and take care of himself and two animals, go grocery shopping, make daily meals, do laundry, do household chores, drive, visit friends, and go to appointments with doctors and lawyers. Although Plaintiff stated that he was mostly housebound, the ALJ noted that Plaintiff also reported being able to engage in a wide array of activities, such as fly training missions, play video games, visit his mother and a few friends, work out, and go kayaking. (R. at 19-21) He also noted that at the hearing, Plaintiff attributed most of his difficulties to his physical problems rather than his mental health. (R. at 19.) The ALJ stated that the fact that Plaintiff

17

was able to do these activities showed that Plaintiff's concentration, persistence, and pace were not seriously limited, because driving, flying, and kayaking require exceptionally good abilities for maintaining concentration, attention, persistence, and pace. (R. at 21.)

Additionally, the ALJ noted that although Plaintiff claimed that his depression and anxiety were severe, he had been receiving treatment for both beginning in 2006, and it did not appear to have affected his ability to work in the years before the accident. (R. at 21-23.) Plaintiff had not experienced any episodes of decompensation. The ALJ did not credit Dr. Brown's GAF score, noting that a GAF score of 55 to 60, which indicates moderate symptoms or moderate difficulty in social or occupational functioning, was inconsistent with the rest of Dr. Brown's observations, including the negative findings upon the mental status exam. (R. at 22.)

Finally, the ALJ found no corroborating evidence in support of Plaintiff's claim that his knee impairment was severe, noting that Dr. Kastenberg's October 2011 examination only noted "tenderness" of the knee. (R. at 23.)

The ALJ next concluded Plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). In support for this conclusion, the ALJ cited to Plaintiff's reports that he

felt better after treatment and medication and had an improved
mood following surgery. He also noted that the array of hobbies
and activities Plaintiff reported demonstrated that he was
capable of adequately performing necessary tasks for light
exertional work. (R. at 25.) In addition, the ALJ carefully
examined the medical records, concluding that the objective
medical evidence consistently reflected mild and moderate
limitations and showed that Plaintiff had the capability to
perform regular and sustained light exertional work. (R. at 25-
29.)

The ALJ additionally noted several inconsistencies that
adversely affected Plaintiff's credibility regarding the
intensity, persistence, and limiting effects of his symptoms.
Plaintiff's professed physical limitations were inconsistent
with testimony that Plaintiff went kayaking eight times during
the alleged period of disability, and were also inconsistent
with Plaintiff's Function Reports, in which he described the
array of activities he engaged in. (R. at 25.) Plaintiff had
also testified that his pain had improved with treatment. The
ALJ further noted that Plaintiff had returned to his old job for
several months in 2012, which required him to perform physical
tasks such as receive inspections, hook up ground power, and
unload aircraft, and lift as much as 200 pounds. Plaintiff had
also testified that he was likely capable of working full-time

19

at his job as a bus driver, and also likely capable of doing customer service at United Airlines. (Id.)

The ALJ concluded that given Plaintiff's RFC and age,[2] applying the Medical-Vocational Rules directly supported a finding of not disabled. (R. at 29 (citing SSR 82-41 and 20 CFR Part 404, Subpart P, App. 2).) The ALJ considered Plaintiff's work experience and education and found there were a significant number of light, unskilled jobs existing in the national economy that Plaintiff could perform. (R. at 29 (citing 20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).) The ALJ thus determined that Plaintiff was not disabled within the meaning of the Act. (R. at 30.)

## III. STANDARD OF REVIEW

The Court has jurisdiction to review the final decision pursuant to 42 U.S.C. § 405(g). When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). The requirement of substantial

---

[2] Because Plaintiff was 45 years old on the date of onset of his disability, the ALJ considered him a "younger individual," defined as ages 18-49 for the purposes of the ALJ's disability evaluation pursuant to 20 C.F.R. 404.1563 and 416.963. (R. at 29.) Plaintiff had reached age 50 by the time of the ALJ's opinion, which shifted his age category to "closely approaching advanced age." (Id.)

evidence, however, constitutes a deferential standard of review, see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance. See Jones, 364 F.3d at 503. Consequently, substantial evidence supports the Commissioner's determination where a "reasonable mind might accept the relevant evidence as adequate" to support the conclusion reached by the Commissioner. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

     In order to facilitate this Court's review, the ALJ must set out a specific factual basis for each finding. Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). However, the ALJ need not discuss "every tidbit of evidence included in

the record." Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir.
2004). Rather, the ALJ must set forth sufficient findings to
satisfy the reviewing court that the ALJ arrived at a decision
through application of the proper legal standards, and upon a
complete review of the relevant factual record. See Friedberg v.
Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

**IV. DISCUSSION**

    **A. Legal standard for determining disability**

    Social security disability claims are reviewed in
accordance with the sequential five-step process set forth in 20
C.F.R. § 404.1520. In step one, the SSA determines whether the
claimant currently engages in "substantial gainful activity."
20 C.F.R. § 1520(b). In step two, the claimant must demonstrate
that the claimant suffers from a "severe impairment." 20 C.F.R.
§ 1520(c). Impairments lacking sufficient severity render the
claimant ineligible for disability benefits. See Plummer v.
Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Step three requires the
Commissioner to compare medical evidence of the claimant's
impairment to the list of impairments presumptively severe
enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If
a claimant does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and five to
determine whether the she retains the ability to engage in
substantial gainful activity. Plummer, 186 F.3d at 428.

The Commissioner conducts a residual functional capacity (RFC) assessment for steps four and five. The RFC assessment considers all of the claimant's medically determinable impairments and makes a determination as to the most the claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1)-(2). In step four, the Commissioner compares the RFC to the physical and mental demands of the claimant's past relevant work to determine whether she can resume her former occupation. 20 C.F.R. § 404.1520(f). If the claimant is unable to resume her former occupation, the Commissioner will then proceed to the final step and decide whether the claimant is capable of performing other work existing in significant numbers in the national economy, taking into account her RFC and vocational factors such as age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Plaintiff presents five challenges to the ALJ's finding, and the Court shall address each in turn.

## B. The ALJ did not err in finding that Plaintiff's sole severe impairment was degenerative disc disease.

Plaintiff contends that the ALJ erred in Step Two by finding that Plaintiff's various mental health conditions were not severe, and argues that the ALJ's opinion was unsupported by the overall record. (Pl. Br. [Docket Item 7] at 14-16.) Plaintiff, however, provides few citations to support his

argument. Citing the definition of a "severe" impairment found in SSR 96-3p,[3] Plaintiff states that he developed increasing panic and lost motivation and had unbearable pain that he had to resume the use of narcotic medication. He also notes that he was assessed a GAF of 55-60. (Id. at 14-15.)

A severe impairment is defined as any impairment that "significantly limits" an individual's "physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), including seeing, hearing, and speaking, and "understanding, carrying out, and remembering simple instructions." 20 C.F.R. §§ 404.1520(c), 404.1521(b); see also SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985). By contrast, where the record demonstrates merely a "slight abnormality or a combination of slight abnormalities" that has, individually or in the aggregate, "'no more than a minimal effect on an individual's ability to work,'" the impairment is not considered severe. Magwood v. Comm'r of Soc. Sec., 417 F. App'x 130, 132 (3d Cir. 2008) (quoting Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003)).

---

[3] SSR 96-3p provides in relevant part that "an impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that as no more than a minimal effect on the ability to do basic work activities." SSR 96-3p.

In evaluating severity, the ALJ must consider the available medical evidence "in order to assess the effects of the impairment(s) on [the individual's] ability to do basic work activities." SSR 85-28, 1985 WL 56856, at *4. Because the plaintiff bears a minimal burden on the issue of severity, "[r]easonable doubts on severity" be resolved in favor of the claimant. Newell, 347 F.3d at 546.

The ALJ's finding that Plaintiff's mental health conditions were not severe was supported by substantial evidence. The ALJ relied on Plaintiff's own testimony, which demonstrated that Plaintiff's depression, anxiety, and insomnia did not prevent him from doing basic work and daily activities. For example, Plaintiff reported that he lived alone, regularly cleaned his home and did laundry, organized his things, took care of paperwork, attended appointments with his doctor and lawyers, drove his car, went shopping, cared for his personal needs, and cared for his dog and cat. He reported enjoying visiting amusement parks and waterparks, traveling, visiting some friends, kayaking, and occasionally flying training missions. Plaintiff also told Dr. Lee that he lifted weights and cycled and was trying to get in shape. The ALJ accurately noted that driving, flying, and kayaking require exceptionally good abilities for maintaining concentration, attention, persistence, and pace, and the fact that Plaintiff participated in these

25

activities indicated that these mental functions were not significantly impaired. (R. at 21.)

Although Plaintiff stated at the hearing that he suffered from depression and anxiety, he attributed his functional limitations to chronic back pain and not to his mental conditions. Similarly, in the Function Reports, Plaintiff stated that it was his back pain that prevented him from participating in more strenuous physical activities and hobbies.

Counseling records and other medical records support that Plaintiff's mental conditions were not the primary cause for his limitations. First, the counseling records show that Plaintiff had been in treatment for anxiety and depression since 2006 yet continued to work at his job for the next three years with no problem. The ALJ thus correctly noted that it was the car accident and the physical symptoms manifested by Plaintiff's degenerative disc disease, and not Plaintiff's anxiety and depression, that caused Plaintiff to stop working in 2009. The same records from after the accident indicate that Plaintiff's anxiety was triggered by stressors related to his physical condition, including financial concerns brought on by his inability to return to his previous job.

Moreover, the medical exam records show that Plaintiff's mental and cognitive functioning was not severely limited by his mood disorders. Despite confirming the diagnosis of depression

and anxiety, Dr. Brown observed that Plaintiff's mood was neutral, his memory was intact, and his speech was fluent and clear. (R. at 425.) Psychiatrist Dr. Wilkins routinely noted that Plaintiff had a cooperative attitude, good comprehension, intact concentration and insight, intact insight, normal speech, and logical thought process. (R. at 481-89, 491.) Based on this evidence, the state agency mental health experts who reviewed the record opined that Plaintiff's mental conditions only mildly limited his ability to perform activities of daily living and maintain social functioning. (R. at 65-66.)

In support for his position, Plaintiff cites mainly to his own statements reporting increased panic, lost sleep, fatigue, and anxiety, which alone are not persuasive. Allegations of pain and other subjective symptoms advanced by a claimant must be supported by objective medical evidence. See 20 C.F.R. § 404.1529. In evaluating Plaintiff's statements, the ALJ must consider a number of factors, including but not limited to the claimant's daily activities, the intensity of the claimant's pain, the medication taken, and any other treatment the claimant receives for pain. SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). As will be discussed in more detail below, the ALJ found that Plaintiff's various complaints concerning the extent of his pain and his mental impairments were not credible in light of the overall objective medical record, and the Court finds

substantial support in the record for his determination. The ALJ was correct in affording this evidence little weight.

In addition, Plaintiff notes that Dr. Brown gave Plaintiff a GAF score of 55 to 60. There was, however, nothing in the record to support that Plaintiff had moderate symptoms or moderate difficulty in social or occupational functioning, as the Court has already explained. Dr. Brown's score not only conflicted with the record as a whole, it also conflicted with his own reported observations from his psychological examination.[4]

Accordingly, the Court finds that the ALJ's determination that Plaintiff's various mood disorders did not constitute severe impairments was supported by substantial evidence.[5]

---

[4] The Court also rejects any argument that the ALJ erred in failing to find that Plaintiff's knee injury constituted a severe impairment. As the ALJ correctly noted, the record is devoid of any evidence, medical or otherwise that Plaintiff's knee impairment significantly limited his ability to perform basic work activities. Although Dr. Kastenberg's examination revealed that Plaintiff had some tenderness and "moderate pain" with motion in his right knee, the examination occurred shortly after Plaintiff underwent knee surgery, and Plaintiff was still in crutches. (R. at 429.) There is little in the record to support that Plaintiff's knee problems were severe, nor did Plaintiff testify that it impaired his ability to perform daily tasks or engage in exercise and sports.

[5] The Court additionally notes that even if the ALJ had erred in finding that Plaintiff's mood disorders non-severe, the error was harmless. The ALJ determined that Plaintiff's degenerative disc disease qualified as a severe ailment, found in Plaintiff's favor at Step Two, and continued with the inquiry. See Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in Salles' favor at Step Two, even if he

**C. The ALJ's determination that Plaintiff was not a credible witness was supported by substantial evidence.**

Plaintiff next asserts that the ALJ erred when he found Plaintiff's testimony regarding his level of pain and his inability to perform certain work not entirely credible. Plaintiff argues that the ALJ should have credited Plaintiff's statements that his pain was "severe" and, based on Plaintiff's testimony, found that he was unable to perform any work. (Pl. Br. at 17–19, R. at 24–25.)

The Court readily disagrees. Plaintiff is, of course, correct that "[a]n ALJ must give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence." Schaudeck v. Commissioner of Soc. Sec., 181 F.3d 429, 432 (3d Cir. 1999). Here, however, Plaintiff's own testimony was that he *could* likely perform a job that required light work. At the hearing, Plaintiff testified that although he could no longer go back to his previous job as a ramp serviceman, he could probably work as a gate attendant, as was suggested by his employer. (R. at 55.) He did not pursue the gate attendant job not because he was functionally unable to perform the duties, but because he hoped that he could go back

---

had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)).

to being a ramp serviceman. Plaintiff testified:

> A. They offered a reasonable accommodation process, . . . where, if you can't do your job, they find you another job –
> Q. Yes, sir.
> A. – and that would maybe be customer service. So I might be able to do that. It's not my first choice of jobs, but you know, that's the only job I think I could do otherwise.
> Q. And what does that job entail, sir, do you know?
> A. That's mostly on your feet standing. That's checking in customers. There is some baggage handling if you're working at the lobby . . . .
> . . . .
> Q. Did you ask for the accommodation? Or did you ask for that job through your union people?
> A. I haven't yet. I want to see if I can do ramp service again.

(R. at 40-41.)[6] At the time of the hearing, Plaintiff was also working a part-time job driving a fifty-six passenger bus. When asked whether he had problems with his back while driving, he noted only that "long runs" lasting six straight hours were "uncomfortable." When the ALJ asked whether he could work as a bus driver full-time, Plaintiff testified that he "imagined so." (R. at 53-54.) Plaintiff's own statements directly contradict the argument he now makes in his brief -- that his pain was so severe that he was totally disabled and unable to perform any substantial gainful activity.

---

[6] Plaintiff's statement was similar to one that he expressed to his counselor in 2011. When asked to discuss alternative or lateral positions he could pursue following his car accident, Plaintiff resisted, saying "I like my job. Why should I be the one to suffer?" (R. at 366.)

Plaintiff contends only that he was placed on "very large amounts of narcotics to the point where they were causing confusion and sleep apnea," and that he tried to go off the narcotic medication but had to resume despite the negative side effects because the pain was "unbearable." (Pl. Br. at 18-19.) However, the mere fact that Plaintiff chose to take opioid analgesics to control his pain in no way establishes, as Plaintiff argues, that he was suffering from pain so severe that he could not perform "modest activities of daily living." (Id. at 19.) It demonstrates only that Plaintiff weighed the risks associated with taking the doctor-prescribed pain medication and concluded that controlling his pain was worth the side effects and discomfort. Indeed, at the hearing, Plaintiff noted that with treatment and medication, his pain had been decreased by 40 percent. (R. at 41-42.)

To the extent Plaintiff makes a separate argument that the ALJ erred in finding Plaintiff's testimony regarding the intensity of his pain not credible, the Court also disagrees. A claimant's allegations alone will not establish disability, 20 C.F.R. § 404.1529(a), and allegations of pain and other subjective symptoms advanced by a claimant must be supported by objective medical evidence. Id. The ALJ must decide "the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it" by looking at

all of the evidence in the record. Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). When evaluating a claimant's credibility, the ALJ must consider the extent to which the claimant's self-reported symptoms can "reasonably be accepted as consistent with the objective medical evidence and other evidence," and a claimant's treatment history and daily activities are relevant factors in assessing credibility. 20 C.F.R. §§ 404.1529(a), (c)(3). As the factfinder, the ALJ may discount subjective complaints that are not supported by the evidence. 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ's determination of Plaintiff's credibility was supported by substantial evidence. The medical record showed that with treatment, Plaintiff experienced improvement in mobility, pain, and sleep from the alleged disability onset date in June 2009. (R. at 26, 305-06, 366-72.) The diagnostic studies within the record also failed to signify abnormal findings. (R. at 26, 277-78, 311-14, 434-35.) Although Plaintiff reported sometimes feeling tender in his lumbar spine, the vast majority of medical records noted that Plaintiff exhibited normal gait, normal neck range of motion, normal range of motion in his arms and legs, normal sensation, normal motor strength, intact cranial nerves, normal straight leg-raising, and no cerebellar deficits. (R. at 292, 308, 320, 323, 331, 334-35, 337, 341, 430, 432.)

Furthermore, the ALJ correctly weighed the evidence of Plaintiff's activities against Plaintiff's subjective statements, see 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (explaining that the ALJ will consider claimant's daily activities when evaluating symptoms, including pain), noting that Plaintiff's activities were inconsistent with claims of disabling pain. The ALJ pointed out that at one point, Plaintiff went back to work as a ramp serviceman, which required lifting objects as heavy as 200 pounds. The fact that Plaintiff was able to perform the very strenuous functions of his old job, even for a few months, suggested that his subjective claims of pain were exaggerated. As already discussed, the record also showed that Plaintiff regularly kayaked, flew training missions as part of the Civil Air Patrol, lifted weights, cycled, played a flight simulator on his computer, cared for personal needs, did household chores, did home repairs, returned to work as a ramp serviceman, and worked as a bus driver, among numerous other activities. (R. at 24-29, 35.) There is little indication that Plaintiff experienced significant pain while doing any of these activities. The Court agrees that engaging in these tasks, and particularly in exercise and sports, requires a degree of flexibility and movement that is inconsistent with a claim of "unbearable" pain.

The Court accordingly finds that the ALJ did not err in

assigning little weight to Plaintiff's subjective statements of pain.

**D. The ALJ did not err in finding that Plaintiff had the residual functional capacity to perform the full range of light work.**

Plaintiff also contends that substantial evidence does not support the ALJ's determination that Plaintiff had the RFC to perform the full range of light work. In particular, he argues that the ALJ erred in assigning little weight to the opinion of Dr. Rosen, who testified, among other things, that Plaintiff had a moderately severe impairment which seriously affected his ability to function; suffered from pain that would frequently interfere with the ability to maintain attention and concentration to sufficiently complete tasks in a timely manner; and would be expected to be absent from work more than two days per month due to his impairment and treatment. (R. at 28.) Plaintiff contends that had the ALJ credited Dr. Rosen's opinion, Plaintiff would have been found disabled. (Pl. Br. at 21.)

Again, the Court finds Plaintiff's argument unpersuasive. When a conflict in the evidence exists, the ALJ retains significant discretion in deciding whom to credit. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). The ALJ is entitled to weigh all evidence in making its finding, and is not required to accept the opinion of any medical expert. Brown v. Astrue, 649

34

F.3d 193, 196 (3d Cir. 2011). In discounting evidence, the ALJ must give a clear explanation for why it is doing so. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 704-05 (3d Cir. 1981).

The Court finds no fault with the ALJ's decision to give little weight to Dr. Rosen's opinion, because there is substantial evidence in the record inconsistent with Dr. Rosen's conclusions. As the ALJ fully explained, Plaintiff's physical examination records consistently showed mostly normal results.[7] Furthermore, Plaintiff's own testimony regarding the activities that he could engage in after his injury, as well as his continued ability to perform everyday activities with little difficulty, showed that his impairment did not "seriously affect[] his ability to function." Finally, the ALJ noted that Dr. Rosen's statement that Plaintiff had an antalgic gait was also contradicted by findings from Dr. Spagnoletti, who observed on a dozen or more occasions that Plaintiff's gait was "non-antalgic." (R. at 379-415.) In short, the ALJ gave a clear explication of why it was discounting Dr. Rosen's opinion, and its decision finds substantial support from the rest of the

---

[7] Testing from Dr. Spagnoletti, for example, showed a normal neurological examination, no atrophy, good balance, normal motor functions and reflexes, and full muscle strength. (R. at 379-415.) Dr. Kastenberg had also observed that Plaintiff experienced only a moderately reduced range of motion, and noted no other abnormalities. (R. at 430.)

record. See Richardson v. Perales, 402 U.S. 389, 401 (1971)
(findings must be affirmed if supported by substantial
evidence).

The Court also readily rejects Plaintiff's vague contention
that the ALJ failed to take into account the MRI records. To the
contrary, even a cursory review of the ALJ's 15-page opinion
reveals that the ALJ examined the records in detail and took
them into careful consideration in determining Plaintiff's RFC.
(See R. at 26-27.) Plaintiff also mischaracterizes the ALJ's
opinion by arguing that the ALJ found a "lack of evidence of
neurological compromise" from the MRI results. (Pl. Br. at 21.)
The ALJ's statement referred only to the results of the November
2008 MRI and accurately reflected the conclusions from that one
MRI. (See R. at 26 (noting "no evidence of cord compression and
no mention of spinal stenosis" in the November 2008 MRI) and R.
at 277 (MRI results, noting "no evidence of cord compression").)
In addition to discussing the November 2008 MRI, the ALJ
discussed other MRI documents cited by Plaintiff, and noted
various disc herniations, radiculopathy, and "impingement on the
thecal sac at several levels." (R. at 26.)

Plaintiff's challenge to the RFC determination rests on
these two arguments, which the Court has now rejected. But even
if the ALJ had erred by giving little weight to Dr. Rosen's
testimony and by concluding from the MRI reports that there was

36

no evidence of cord compression and neurological compromise, the error was harmless. Contrary to Plaintiff's contention (see Pl. Br. at 21), the evidence does not support a finding that Plaintiff was totally disabled and "unable to do any substantial gainful activity." 20 C.F.R. § 404.1527(a)(1). There was overwhelming evidence to support the ALJ's determination that Plaintiff had the RFC to perform the full range of light work.

An individual's RFC is an assessment of the most he can still do, despite the limitations caused by his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). "Light work" is defined as work which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." To be capable of performing the full range of light work, a claimant must be able to do "do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ makes an RFC finding based on all relevant evidence, including the medical records, medical source opinions, and the individual's subjective allegations and descriptions of his own limitations. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).

In the present case, the ALJ took all of this information into account before determining the RFC. The ALJ credited

37

Plaintiffs' statements of his symptoms based on the medically determinable impairments where they were supported by the objective record. In particular, the ALJ noted (1) the MRI reports revealing multiple disc herniations and radiculopathy; (2) the various treatments and medications administered by Plaintiff's doctors for pain; and (3) the minor abnormalities and limitations noted by Plaintiff's doctors, such as trigger points, lumbar tenderness, and muscle spasms. However, the ALJ also noted that neither the objective medical evidence nor Plaintiff's self-reported activities supported a finding that Plaintiff had totally disabling impairments and limitations.

In particular, the ALJ noted that the physical examination records showed mostly mild physical limitations. In addition to the records from Dr. Kastenberg and Dr. Spagnoletti discussed above, the ALJ considered records from Dr. Padula. (R. at 26.) Like Plaintiff's other doctors, Dr. Padula recommended against surgical intervention, and his examination also revealed that Plaintiff had normal gait and extremities, grossly intact cranial nerves, normal straight leg raising, and no motor weakness or atrophy, although he was tender to palpation with flexion and extension of his lumbar spine. (R. at 320, 323, 331, 334-35, 337, 341.) Likewise, Dr. Lee observed that Plaintiff exhibited "good" strength, grossly intact sensation, intact cranial functions, normal and independent walking ability, and

no dysarthria, aphasia, or dysmetria. (R. at 308.)

There is also substantial evidence in the record that Plaintiff felt significantly better after his IDET procedure in December 2009. In counseling, approximately one month after his procedure, Plaintiff noted that he was satisfied with the procedure and effectiveness of the medications and expressed an interest in returning to work. Plaintiff testified at his hearing that his pain had improved at least 40 percent with treatment. (R. at 41-42.) One year after his procedure, in late 2010, Plaintiff still reported that he was "doing well," expressing an interest in stopping pain medications and in returning to work. In March of 2013, approximately four months before his hearing before the ALJ, Plaintiff saw Dr. Kastenberg, who noted that Plaintiff's cervicalgia and back pain were "resolved," his depression "improved," and he was "doing well" with managing his anxiety. (R. at 467.)

Finally, the ALJ credited Plaintiff's own statements regarding the activities he was able to engage in, including exercising, cycling, kayaking, and lifting weights. (R. at 50-51, 308.) The ALJ also noted that Plaintiff returned to work as a line serviceman for several months in 2012, a job which required the performance of tasks far more strenuous than those

required by light exertional employment.[8] Here, the ALJ credited Plaintiff's statement that he missed work due to his impairments, but nevertheless noted that "[t]he fact that the claimant would even attempt to do this work indicates that he certainly believes that he is capable of at least light exertional work on a regular and sustained basis." (R. at 25.) The ALJ further noted Plaintiff's testimony that he would probably be capable of working full-time, either as a bus driver or at United Airlines doing customer service.[9]

The ALJ plainly reviewed all of the relevant evidence and provided a clear explanation of the reasons for his

---

[8] Specifically, Plaintiff testified to the following:
    A. I worked all the way up until December [2012] — mid-December [as a ramp serviceman] until I was — I recommended to go to [the employee assistance program] or to save my job.
    . . .
    Q. Okay. And basically you're good enough to go back and do this job, is that correct [phonetic]?
    A. Yeah.
    Q. Do you think you can do it?
    A. I feel good — better now, but lifting is still painful and I — you know, I can only speculate that I would — I have to give it a try.
(R. at 39.)
[9] The Court has already noted Plaintiff's various statements indicating his ability to engage in daily household activities and various hobbies without difficulty, and will not repeat them here. The Court notes that the ALJ took these statements into account, observing that Plaintiff's self-reported activities "further demonstrate that the claimant has been capable of adequately performing the necessary tasks for light exertional work, including but not limited to the necessary amount of lifting, carrying, pushing, pulling, walking, standing, sitting, climbing, crouching, stooping, and kneeling." (R. at 25.)

determination that Plaintiff retained the RFC to perform a full range of light work. See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004); Fargnoli, 247 F.3d at 41 (3d Cir. 2001). Based on all of the above, the Court has no trouble concluding that substantial evidence supports the ALJ's RFC determination. See Lane v. Comm'r of Soc. Sec., 100 F. App'x 90, 95-96 (3d Cir. 2004) (citation omitted) (finding that without medical evidence on behalf of a claimant describing his or her work-related functional limitations, the claimant "cannot establish disability under the Social Security Act").

**E. The ALJ did not err in finding that there were a significant number of alternate jobs that Plaintiff was able to perform.**

In step five, the ALJ considered whether Plaintiff possessed the capacity to perform other work existing in significant numbers in the national economy, given the Plaintiff's residual functional capacity, age, education, and work experience. See 20 C.F.R. §§ 1520(g), 404.1560(c). The ALJ evaluated the Medical-Vocational Guidelines ("Guidelines" or "Grids") set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, and noted that, because Plaintiff possessed the RFC to perform the full range of light work, the Guidelines directed a finding of "not disabled." (R. at 29.)

Citing Sykes v. Apfel, 228 F.3d 259 (3d Cir. 2000), Plaintiff argues that the ALJ should not have relied exclusively

on the Medical-Vocational Guidelines to find that Plaintiff was able to perform "other work." (Pl. Br. at 23-26.) Plaintiff's argument, however, rests on the premise that the ALJ erred in his RFC determination by failing to find nonexertional impairments. For the reasons that follow, the Court finds the ALJ's reliance appropriate.

In order to determine whether jobs exists in the national economy for a particular plaintiff, the ALJ examines the Medical-Vocational Guidelines and considers a claimant's age, education, work experience, and residual functional capacity. If the claimant has nonexertional limitations that limit the work permitted by his exertional limitations, the Guidelines will not accurately determine disability status. In these situations, the ALJ cannot simply rely on the Medical-Vocational Guidelines to make a finding; the ALJ must support his determination by relying on vocational testimony or similar evidence to determine the manner in which the claimant's nonexertional impairments affect his residual functional capacity. See Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir. 2000); Hall v. Comm'r of Soc. Sec., 218 F. App'x. 212, 217 (3d Cir. 2007). If, however, the Plaintiff exhibits "only exertional (i.e. strength) impairments, the ALJ may properly rely in step five solely upon the Grids." Padilla v. Comm'r of Soc. Sec., No. 14-007, 2015 WL 1006262, at *12 (D.N.J. Mar. 6, 2015) (Simandle, J.) (internal quotations and

42

citation omitted); see also Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate.").

The Court has already examined at length why the ALJ's RFC determination was supported by substantial evidence, and need not repeat the analysis here. Instead, the Court will rely on its discussion in the preceding sections to hold that, for purposes of the inquiry at step five, the ALJ properly determined that Plaintiff could perform the full range of light work with no additional nonexertional limitations.[10]

Plaintiff himself admits that the Third Circuit's direction to consider evidence beyond the Grids applies only if a plaintiff exhibits nonexertional impairments. (Pl. Br. at 24

---

[10] Specifically, in Part IV.B, the Court found that substantial evidence supported the ALJ's determination that Plaintiff's mood disorders did not constitute severe ailments. Having reviewed the evidence cited in that section and by the ALJ (see R. at 19-23), the Court finds that it does not "demonstrate the existence of significant psychological limitations . . . inconsistent with a full range of work at any level of exertion," as Plaintiff argues. (Pl. Br. at 25.) Likewise, in reviewing the explanation in Parts IV.C & D for why the ALJ was correct in not crediting Plaintiff's statements regarding the limiting effects of his pain, the Court finds that the evidence does not support Plaintiff's claim of "numerous postural limitations . . . inconsistent with a full range of work at any level of exertion." (Id.) The evidence as a whole substantially supports the ALJ's finding, clearly explicated in the opinion, that Plaintiff had the residual functional capacity for a full range of light work, with no nonexertional limitations.

("'The regulations do not purport to establish jobs that exist
in the national economy at the various functional levels when a
claimant has a nonexertional impairment'" (quoting <u>Sykes</u>, 228
F.3d at 269)).) Because the ALJ found that Plaintiff had only
the exertional limitation of light work, the ALJ was permitted
to rely only on the Grids to determine whether there are jobs in
the national economy for Plaintiff. <u>See</u> <u>Jefferson v. Comm'r of
Soc. Sec.</u>, No. 13-5204, 2014 WL 4828225, at *9 (D.N.J. Sept. 29,
2014) (ALJ may rely solely on Medical-Vocational Guidelines
"[w]hen a plaintiff has purely exertional limitations"); <u>Nieves
v. Comm'r of Soc. Sec.</u>, No. 12-5590, 2013 WL 3811645, at *4
(D.N.J. July 22, 2013) (citing <u>Sykes</u>, 228 F.3d at 269); <u>Esh-
Sheikh v. Bowen</u>, 1989 WL 281946, at *16 n.3 (D.N.J. Oct. 25,
1989).[11]

Having reviewed the Medical-Vocational Guidelines, the
Court also finds that the ALJ correctly applied the Guidelines
to Plaintiff. "Where a claimant's qualifications correspond to
the job requirements identified by a rule, the guidelines direct

---

[11] The Court also rejects Plaintiff's objection to the ALJ's
citation to SSR 85-15. (Pl. Br. at 25.) The ALJ cited several
Social Security Rulings (SSRs) in a standard paragraph that
merely described when and how the Medical-Vocational Guidelines
should be used. (R. at 29-30.) The citation to SSR 85-15 was
solely for the proposition that the Guidelines provide a
framework for decisionmaking "[i]f the claimant has solely
nonexertional limitations." (R. at 30.) The ALJ did not actually
apply the rule to Plaintiff's case since Plaintiff clearly did
not fall into that category.

a conclusion as to whether work exists that the claimant could perform." <u>Heckler v. Campbell</u>, 461 U.S. 458, 462 (1983). The ALJ correctly noted that Plaintiff could be considered a "younger individual aged 18-49" because he was 45 years old on the alleged disability onset date in 2009. Because Plaintiff had turned 50 by the time the ALJ rendered his decision, Plaintiff could also be considered an individual "closely approaching advanced age," encompassing individuals between the ages of 50 and 54. (R. at 29.) Furthermore, since Plaintiff had completed one year of college, he would be considered a "high school graduate or more." (<u>Id.</u>) Based on Rules 202.14 and 202.21 of the Guidelines, corresponding to younger individuals and individuals closely approaching advanced age, respectively, the ALJ properly concluded that Plaintiff was not disabled under either age category. <u>See</u> 20 C.F.R. Part 404, Subpart P, App. 2, 202.14, 202.21.

The Court therefore finds that the ALJ's use of the Medical-Vocational Guidelines was not in error.

**F. The ALJ did not err in failing to consider Plaintiff disabled for a closed period of disability.**

Error was also committed by the ALJ, according to Plaintiff, because the ALJ failed to consider whether Plaintiff was disabled for any closed 12-month period following the alleged onset of disability. He notes that because the

definition of "disability" requires only that a claimant be unable to engage in gainful work for a continuous period of 12 months, a claimant may be eligible for benefits "during a closed period of disability if impairments prevented substantial gainful activity for at least 12 continuous months and disability ceased before the date of adjudication . . . ." (Pl. Br. at 26 (citing POMS DI 25510.010).) He argues that Plaintiff would have met these conditions had the ALJ considered a closed period of disability.

The Court is not convinced that any error was committed by the ALJ. First, there is no indication from the record that Plaintiff ever took the position that his disability ceased before the date of adjudication, and he was seeking a closed period of disability. To the contrary, Plaintiff specifically argued before the ALJ that he's "been disabled since the alleged onset date of June 2009" and was still disabled at the time of the ALJ hearing on August 8, 2013. (R. at 36, 39, 41, 57-58.) Voluminous medical records spanning more than four years were also submitted before this Court, and Plaintiff has argued throughout that his disability continues to this day. (See, e.g., Pl. Br. 18-19.) Plaintiff contends that the ALJ failed to consider a closed period of disability, but nothing suggests that Plaintiff even requested such a determination. Cf. Nelson v. Astrue, 32 Fed. App'x 195, 197 (3d Cir. 2009) (noting that

46

attorney had consulted with claimant and had authority to accept a closed period of disability); Plaza v. Barnhart, 218 Fed. App'x 204, 205 (3d Cir. 2007) (noting that claimant had amended his claims before ALJ to request a closed period of disability).

Nor does the Court agree that the ALJ failed to consider whether Plaintiff was disabled for any consecutive twelve-month from the date of alleged onset of his disability. On the contrary, the ALJ's statements at the hearing and the ALJ's opinion show that the ALJ considered Plaintiff's condition each year and determined that Plaintiff was not disabled for any sustained period of time between June 2009 and the September 2014. At the hearing, the ALJ asked Plaintiff to describe his impairments year by year and paid close attention to the months after the onset of alleged disability. For example, he asked Plaintiff why he stopped working in 2009, whether there came a time after June 2009 when he felt some gradual improvement, when Plaintiff began physical therapy after his accident, and how long Plaintiff could stand on his feet in 2009. (See R. at 42, 44, 46, 50.)

Additionally, contrary to Plaintiff's contention, the ALJ's opinion specifically addressed the multitude of records dated between 2009 and 2011. The ALJ pointed out that (1) medical records showed Plaintiff reporting a stable mood, improved sleep, and "minimal side effects" from pain medication as early

47

as September and October of 2009; (2) Plaintiff reported improvement in his symptoms after his surgery in December 2009; (3) Plaintiff reported in January 2010 that he was experiencing increased mobility and reduction in physical pain, and reported further improvements in mobility to Dr. Lee in November and December of 2010; (4) MRI reports from 2008, 2009, 2010 all reflected modest findings; (5) counseling records showed that Plaintiff believed that he was able to return to his previous job as early as January 2010; (6) Plaintiff began exercising and cycling in November 2010; (7) Plaintiff joined the Air Patrol in 2011 to fly training missions; and (8) Plaintiff began kayaking in the summer of 2011. (R. at 20, 21, 25, 26, 27, 28.) Additionally, based on his own statements in the Function Reports and his testimony before the ALJ, Plaintiff appeared to have been independent and mobile throughout the relevant time period, including in 2009 and 2010. Nothing in the record suggests that Plaintiff was prevented from performing daily activities and chores in the first two years after the alleged onset of disability.

Based on the above, the Court finds no error in the ALJ's evaluation of the record evidence.

## IV. CONCLUSION

The Court finds that substantial evidence supports the ALJ's determination that Plaintiff did not have a qualifying

48

disability under the Social Security Act. The Court,

accordingly, affirms the ALJ's decision. An accompanying Order

will be entered.


 **March 31, 2016**                    **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       Chief U.S. District Judge